v. United States Okay, the next case before the court is AK Steel Corporation v. United States. Case number 13-1136. Again, Ms. Cannon, you're reserving three minutes for rebuttal? Yes, Your Honor. Okay. And we are dividing up five and ten? Yes, Your Honor. All right. And Mr. Lewis, you're going first? No, Your Honor. I will be going first. All right. Carl Von Trills of the United States. So we're going first with the ten minutes? Yes, Your Honor. Okay. All right. Ms. Cannon, you can begin. May I please report? I'm Kathleen Cannon, representing the appellants Allegheny Ludlam and North American Stainless in this appeal. The ITC's conclusion below was based on a fundamental misreading of the statute. The statute requires merely that the likely volume of the imports be significant if the order is revoked. As the ITC admits in its brief at page 31, the relevant volumes here were significant and would remain so. But rather than finding that this statutory factor was met below, the ITC instead substituted a new statutory requirement that there be an increase in imports and found that that statutory requirement was not met. A couple of things. One, it seems to me that given that the record evidence that you're referring to in your brief referring to underselling by Mexinox was occurring in a third of the comparisons and the commission looked at it and in effect said, well, we're putting more significance on the fact that it's not occurring in two-thirds. Can't they do that? Can't they weigh that evidence? Yes, Your Honor. That would be the pricing factor. So we have three factors, as you know, in the injury analysis under 19 U.S.C. 1675 A.A.1, volume, price, and impact. And the commission needs to look at all three factors. And in reaching the volume analysis, we believe there was a legal error of the type I just described. So you're okay with the pricing? No, Your Honor. In the price analysis, there was an evidentiary error. And I can adjust that if you'd like instead at the moment. So there are two different statutory factors. And then the impact factor, which was the third factor, basically relied on its findings on volume and price to get to the negative impact finding. And so by virtue of the errors in the volume and the price factor, that tainted the impact finding as well. Okay. But even if it's true that all you need is significant as opposed to a significant increase, a significant number of imports, even if that is true, that's not determinative of the negative impact, correct? That is correct, Your Honor. But that is one of the factors that the commission is required to look at by the statute. And if it was to recognize that the import volumes were significant here, instead of finding that they were not, that that statutory factor was not met because there was not going to be an increase, that would have checked the first box, if you will, in the three factors. And instead, there was an X marked in that box. No significant volume increase. So they moved on to see if there was any adverse price effects. By going past the volume factor and not recognizing if it should have, that the volume was significant and would remain so, which is what the evidence showed, that dispensed with one of the critical statutory findings. Are you saying that they have to use specific magic words as they walk through the analysis? I mean, isn't it appropriate for the Court of International Trade to determine that what they ultimately concluded, that they may have been significant but not at an injurious level? We are not contending that they have to use magic words. I do think there is a substantial difference between saying, are the import volumes significant or would they increase? Those are two different tests. Are they significant and would remain so, which evidence shows they would? Or would they increase from this already significant level, which is a higher burden? So I think that's not just magic words. But to your point about if they are currently non-injurious, then don't they have to increase, which is effectively what the ITC has responded here. To that point, I would say the Commission is assuming that if they're currently non-injurious, then if you take the order away, they have to increase to cause injury. And that is wrong because what they're missing is that you're going to take the dumping order away. And once you take the dumping order away, the Commerce Department found, and this is not challenged on appeal, that they would start dumping at a 30% magnitude. A 30% dumping margin, which is not going on in the market now, could in fact be injurious at a significant volume level. So if you correct and say the imports are significant. Just so I understand that. So you want to distinguish essentially the pricing change of behavior from a volume change. Did I understand you just to say that at exactly the same volume, if they start selling at a 30% lower price, that could cause injury that the same volume at the current price does not cause? Exactly, Your Honor. Exactly. If you take a significant volume level, which is where we are, and you combine it with removing an order and allowing them to dump at a 30% margin, which the Commerce Department found would occur, then you could have a significant price effect. And respondents say to that, the ITC says to that, well, the margin of dumping is different than underselling. And I am not arguing that it is the same. Dumping and underselling are different. But dumping is not irrelevant. In the statute, 19 U.S.A. 1675 AA6, specifically authorizes the commission to consider the magnitude of the dumping margin. Precisely because once you dump at a higher level and there is more price discrimination, there is an increasing chance that you are going to have adverse price effects and increase the underselling, which is then at a significant volume level going to cause injury to the domestic industry. Ms. Cannon, I want to give you a chance to respond to something that bothers me, and that is in your section of the brief on veto power held by TCM. On page 24 of the brief, it says there is no record evidence that SLUSA ever vetoed SSSS imports from Mexico, or even that any such veto was likely. And on page 26, you say TCM crop has demonstrated no incentive or practice of exercising its claim veto power. In the commission's findings in footnote 130, the commission relied on a finding that there was an incentive to exercise the veto power, and that included testimony by the chairman of the Global Division Management Board that he had directed the VP for Sales to cut off, these are quotes, any imports from Germany, Italy, or Mexico that could prove harmful to SLUSA. In joint appendix on 18, 19, and 20, the commission discusses pricing data, and it says, it concludes, the price sensitivity of the U.S. SSSS market suggests that the Vice President of Sales for SLUSA will have to strictly manage subject imports from Mexico to prevent entry to SLUSA. Why couldn't that testimony and that pricing data be considered record evidence that TCM crop had an incentive to veto imports? And doesn't that directly contradict your statement in the brief that there wasn't any evidence to that effect? Our statement in the brief was not that there wasn't any evidence to that. It says, let me read it. There is no evidence that the veto power TK held was ever applied or would be applied to imports from Mexico. Your Honor, we were arguing that there was no evidence that the veto power had ever been applied, and there wasn't an indication based on the import volume controls that there had ever been any limitation. The imports from Mexico were pouring into the United States. The veto power was controlling the imports from Germany and Italy, and that's why this appeal, even though there was a negative decision issued by the ITC on Germany and Italy, we have not challenged that finding because Germany and Italy were different. That was what the local supply policy was all about. We're going to treat European imports as different because there are the different exchange rate and logistical costs, but Mexico was part of the North American market for them. You're not answering my question. Your Honor, I understood your question to be was there any evidence that they had vetoed imports, and the answer is absolutely not. I'm reading from your brief. Or even that any such veto as to imports from Mexico was likely. Was likely because the policy had been in place for a while. There was no evidence that it had ever been used. I don't understand how you can say here's our veto power, and we are applying it here. I think in order to say that a policy is being effectuated, you have to demonstrate factually how that is being effectuated. That was what the Newport case, the Court of International Trade, was all about. Newport II, the second Newport case, was all about, and we were involved in that case, so I know the facts, we came in and had to supply significant evidence showing that the veto power of ArcelorMittal was actually controlling and limiting the imports, that they were vetoing the imports and blocking them from coming in, and that there was only a very small amount of any coming in. That's what that court decision in the record showed. Here, it's just the opposite. Mexican imports are coming in. There is no evidence of any veto power ever being used to control them. They said they had it, and they clearly were using it for Germany and Italy, but there is no evidence it was ever being used to Mexico. In fact, Your Honor, the policy they articulated was this was Mexico's market. This was the whole point. They were having a certain type of product come in from Mexico and a certain type be supplied by the U.S. That was the policy. That doesn't suggest a veto. The facts simply don't support the claim that as to Mexico, that veto power was used or would be used, because the policy was to use Mexico to supply the United States with the type of stainless steel that the U.S. operations of TK were not producing. You're arguing the weighing of evidence. No, Your Honor. I'm arguing an absence of evidence. There is no evidence of use of a veto power. You can ask the opposing counsel when they come up if there is evidence I'm missing. I don't even have to. I mean, I'm looking at the findings from the government, from the commission, and it says testimony from the chairman of ThyssenKrupp that he had directed the VP to cut off any imports from Mexico that could prove harmful to S.O.U.S.A. That seems to me to be evidence. It's testimony. Then you're talking about weighing it. No, Your Honor, and let me back up for a minute too. What we're talking about is meeting the three statutory factors. The first one is volume. Is the volume significant? Irrespective of this policy, the volume already was significant from Mexico. There's a finding of that by the commission here. So whether he had a veto power or not, the commission found the volume coming in right now from Mexico was significant. That's all you need under the statute. The second part of the statute is price. Were the prices being undercut? He said, I'm going to veto anything that will come in that would harm the U.S. But was anything coming in already underselling U.S.? Yes, one-third of the time. They say that's not significant. I'm not challenging whether the one-third is significant. I'm challenging if you take the order away and you allow them to dump it 30 percent, could there then be significant price adverse effects? They didn't address that. They didn't address that. So you have factual evidence that isn't consistent with the articulated policy, and that's what we are challenging here, Your Honor. Let me ask you, we're just into your rebuttal, so I'm going to ask this quickly so that you have an opportunity to respond to the waiver argument because you know that's going to be coming. Yes, Your Honor. You point to some pages where you say you raised it, but those pages were sort of generalized. There was no specific point in which I could find that you actually raised it below. Your Honor, yes, I would not challenge that we have not raised it in the same way. We have raised the volume argument. We've consistently challenged their finding on volume. We challenged it as an evidentiary matter below. We didn't raise it and articulate it as a legal matter until we got to this court, so I'm not arguing otherwise. I am saying that under the standards of the Dynatech exceptions, we fall squarely within them. It's purely an issue of law, and it's a very important issue that we think is critical to the case. I would also point you to the framework of the issue that the ITC articulates at page 2 of its brief where they say that the issue here is whether the commission's analysis of volume was supported by substantial evidence and in accordance with law. They don't reach that second point if they don't follow the statute. Okay. All right. Thank you. Thank you. We'll give you your full three minutes for rebuttal, and we'll give an extra minute. Should we give that to the government, or should we give it to Mr. Lewis? Oh, you can give it to me. Okay. Thank you. To the government. Okay. Please, the court. My name is Carl Von Schriltz of the U.S. International Trade Commission, and I will argue on behalf of Defendant Apolli that you should affirm the commission's negative determination in the Sunset Review of Stainless Steel Sheet and Strip from Mexico. I will take 10 minutes, and Mr. Lewis, as we've already discussed, will take five. Can you clarify something about the way this works for me? Suppose it turns out that, I guess, the new owner of the Mexican and Alabama plant don't behave in accordance with the assumption based on incentives that the commission made, or maybe even suppose it turned out that the thing hadn't been sold and Krupp was also not behaving in accordance with the assumption. What happens? Is there some way of reapplying the anti-dumping order to them, or does a whole new proceeding have to get started? Your Honor, once the order has been revoked, I think the domestic producers could file a new petition. For a whole new anti-dumping duty order? Yes, Your Honor. Okay. Initiating a new proceeding. Let's address the last point that we were talking about. You argued that this issue was waived because it wasn't raised in the same format below. Yes. But it's clear that they raised an objection to the volume determination, correct? Yes. And isn't it true that the commission has to apply a legally correct standard? Well, Your Honor, as you pointed out, and Ms. Cannon did not disagree, nowhere before the lower court did they argue that there was a statutory problem with the commission's analysis of likely volume. Their only argument was that the commission lacked substantial evidence for its finding that subject import volume was unlikely to increase from current non-injurious levels. So they raised a substantial evidence claim. They admit as much. This is a brand new claim that the lower court did not get an opportunity to pass on, and that's why we argue that they waived that argument. But you concede, though, as I read your brief, that there clearly was a finding or an implied finding of significance. Yes, Your Honor. In its accumulation analysis, the commission found that the current volume of subject imports from Mexico were significant, and then later in the likely volume section, the commission recognized that subject imports from Mexico accounted for most accumulated subject imports from Germany, Italy, and Mexico. So that was tantamount to a recognition that the current level of subject imports were significant. But as Your Honors pointed out, that doesn't require a likely affirmative finding of likely injury, because the commission very clearly explained in the determination that current level of subject imports was non-injurious. It was consistent with what the commission found to be robust domestic industry financial performance. When subject import market share peaked earlier in the period of review, the industry had an operating margin of over 11%. But if you then take that significance and you overlay it on the fact that there was a 30% price margin, doesn't removing the order have an injurious effect when you combine the two? Well, Your Honor, the commission considered the likelihood of significant underselling and adverse price effects. There's no statutory requirement that the commission consider the likely margin of dumping calculated by Commerce. I mean, typically Commerce's finding on likely dumping margin is simply its original finding from the original investigation. Here the commission considered the likelihood of significant underselling and adverse price effects and found that such underselling and price effects were unlikely because subject imports generally oversold the like product during the period of investigation, while like product prices increased significantly because Tiff's and Krupp's local supply strategy would likely restrain subject import volumes and prices to non-injurious levels, and because Mexinox had been able to maintain its pre-order share, its historic share of the U.S. market, while predominantly overselling the like product since imposition of the order. And based on that evidence, the commission reasonably concluded that Mexinox would likely have no reason to resort to significant underselling to maintain its historic share of the market, which the commission found was likely. What is the standard the commission uses for determining significance of volume apart from injury? Your Honor, it really depends on the facts of the case. In this case, the commission thoroughly analyzed... No, I'm sort of... I'm almost asking a... It seems to me significant in the ordinary course would mean... Is that... Or does it just mean, you know, more than two sheets of steel? Would a purely numerical thing completely undetached from potential effect on the market? This is literally a... What is the meaning question? How do you ask a significance question without embedding questions about injury? Yes, Your Honor. Well, I think if the commission finds that significant underselling is likely, it's essentially a finding that subject imports will likely undersell the like product to a significant degree in most instances where comparisons are possible. When it comes to significant subject import volume in market share, I think it's significant in that sense means numerically significant. And in here, the market share is actually confidential. You know, it was not a huge market share. In fact, the market share held by accumulated subject imports in the last year of the period of review was lower than the market share held by those imports in the last year, 2004, the last year of the first review period, and in 1998, the last year of the original period of investigation. So even though the commission did indeed find that subject import volume was numerically significant, it explained in great detail why the continuation of subject import volume at that level would not likely result in material injury. It was consistent with robust domestic industry financial performance. The domestic industry was not vulnerable to the continuation or recurrence of material injury. Having restructured and invested in new facilities, appellants don't challenge that finding. I would like to address some more of the appellant's substantial evidence challenge to the commission's analysis, which does reprise arguments that they raised below. Appellants highlight certain evidence such as the importance of the U.S. market to Mexinox that in their view warranted a different result. But none of this evidence is consistent with the commission's analysis. In fact, it's a mere invitation for the court to reweigh the evidence. Well, it detracts from the reasonableness. I mean, it might not ultimately result in our reversal given that the standard we have to apply. But certainly there is a lot of evidence on which the commission could have gone the other way. Well, this is true, Your Honor, but the SAA recognizes that sunset reviews are inherently speculative and predictive and the possibility of other likely outcomes doesn't render the agency's determination erroneous. And here the commission addressed the evidence that appellants highlight and explained why it wasn't in fact inconsistent with their negative determination. For example, the commission recognized that the United States was Mexinox's primary market but also explained that most of Mexinox's total sales were internally consumed or sold to home market customers. And it also explained that Mexinox lacked the capacity or the incentive to significantly increase its exports to the U.S. market. And that's a finding that the lower court sustained and that appellants haven't challenged here. Appellants also highlight two announcements issued by ThyssenKrupp to its U.S. customers in 2011. But these announcements do not suggest that ThyssenKrupp or Mexinox intended to grow its presence in the U.S. market as appellants contend. If the lower court correctly noted, these announcements were responses to concerns about Mexinox's ability to maintain its sales given the anti-dumping orders. This finding was fully consistent with the commission's conclusion that subject imports were likely to remain at or below historic levels after revocation. Appellants also claim that the commission failed to consider the restraining effect of the order. But this is untrue. The commission expressly considered that issue and found that the imposition of the order has not demonstrably restrained the volume of Mexinox's exports to the U.S. and subject imports from Mexico have maintained a relatively constant share of the U.S. market since the original investigation. This finding led additional support to the commission's conclusion that the likely volume of subject imports would not increase after revocation. I see that my time is up. If your honors have no further questions. No. No further questions? Thank you, Your Honor. Good morning, Your Honors. For the record, I'm Craig Lewis with Hogan Levels here on behalf of the Mexican respondents in the case below. I'm mindful that the commission counsel has done an excellent job and I don't want to, if I can, possibly even take up all of my time here. I just wanted to address a couple of issues. Before doing so, just as a general comment, I concur completely in the view that was expressed that this is really essentially a plea for a reweighing of the evidence. I think the standard of review that this court applies in these types of cases, which is not to reweigh the evidence or to interpose a decision that the court thinks may be more supported by the evidence. That's certainly true, of course. Any time the appellate court does an analysis, we have those institutional limitations. But having said that, if there's evidence on one side and very little evidence on the other, it's not a question of really reweighing. Sometimes it's a question of finding out whether there's any evidence to support it. I'm pointing to the point that Judge Wallach made before. Yes, there was testimony that this veto power existed, but there was also absolutely no evidence that was ever used. Isn't it also just as reasonable a conclusion that perhaps the veto power was in name only? I don't agree. I think there is evidence that affirmatively supported the interpretation that the Commission took. An example of that one is that the authority that the marketing director, this vice president, who gave the testimony exercise was actually the culmination of over a decade of consolidating marketing authority for all three. And as it turned out eventually, when there was a U.S. company, a fourth company, it was all consolidated over a 10-year period in this vice president to exercise that authority. So that was sort of the structural background that led to him being in the position to exercise that authority. And the economic rationale that led the company to consolidate authority in this vice president was the local supply strategy, which with the investment, $1.4 billion investment in the Alabama mill meant that there was a new focus, economically speaking, for the company, which was to protect this brand new investment. Can you explain to me economically what that means? I thought sunk costs are ordinarily ignored in pricing decisions. I'm sorry, what are... Sunk costs. So they spent $1.4 billion building a plant. What does that have to do with their going forward pricing? What it has to do with is that there was a marketing plan for that mill. It was to... In fact, when you talk about local supply, local supply meant the integrated operations, not just in the United States, but also in Mexico. They were to operate in a complementary fashion. And the structure that was envisioned as the local supply strategy was that the Alabama mill would focus on so-called 300 series steel. Initially, right? Initially. There was a plan to get into the fancier stuff. Right. And that it would supply feedstock to the Mexican mill that would be returning 400 series product to the United States. And so the economic incentive not to disrupt or damage the interest in the Alabama mill was not to increase volumes or market in the US at prices that would cause damage to the sales of 300 series product that was being produced in Alabama. And those prices were actually tied because it's relatively easy to shift supply. Correct. And the commission made that explicit finding based on the price sensitivity of the product that you couldn't, for example, undersell 400 series product without having an impact in the market on the 300 series product. And that economic reality is part of what restrained... would restrain the imports and would lead the marketing director, the vice president to exercise his veto power. If I do have a minute, I did want to address one issue I think that's... that may aid the court in evaluating some of the arguments you heard this morning and in the briefs. And I'm speaking specifically of the dumping margin issue. A couple of key points on that. First, to say that a product is dumped in the United States, just to be absolutely clear, means that you're selling the product in the US market at a price when compared to the price in Mexico, in this case, is lower in the United States. That says nothing. That speaks not in any way, shape, or form to whether that price in the US compared to market prices in the US compared to the petitioner's prices are lower. It just says it's lower than they are in Mexico. So you could be the highest priced seller in the US market and still be dumping because the prices are higher in Mexico. And I think it's for that reason that the statute does not require the commission to even consider the dumping margin. If you read the statute, 1675A... A6, the commission is only directed that it may consider the dumping margin. Elsewhere, you look through the statutory provisions in A1... The directions are all in mandatory terms. The commission shall consider this, shall consider that. In the case of margins, it is a may, and that's not a happenstance or haphazard, but that's in the statute. It's because of what I'm describing here, that it would be highly misleading for the commission to assume that a 30%, a 50%, or even a 100% margin said anything about whether you were going to price in the US market at below market prices or injurious price levels. So I just think it's important to separate those issues. One last comment on the margin as well, I think it was alluded to, but it's a little bit outside the scope of what's before us here, but the Commerce Department's findings on likely margins of dumping are essentially a rubber stamp of what was done in the original investigation. It has very little meaning for them to say that a dumping margin would be what it was in an original investigation. Moreover, in this case, that original investigation was at least 15 years earlier under a completely different economic circumstance, both within the US industry, where the industry had consolidated in the meantime, and just in terms of the disencrypt structure as well. Nothing has changed. Take your time with that. Okay. Thank you. I'd like to just address a few of the points they raised. Just a question about whether we are asking the court to re-weigh the evidence. We are not asking the court to re-weigh the evidence, specifically on the volume factor. That's a legal issue,  And I think that's a good question. And they did not, and that's not a re-weighing of the evidence. The other factors we're applying, we're asking the commission simply to determine whether there was substantial evidence, and on several, there are not. Let me specifically address a couple of the points raised regarding the low-supply strategy. In response to your question as to whether there was evidence of actual use of the veto policy, I did not hear Mr. Lewis articulate any at all. He articulated rationales, but he did not identify anything showing that that veto power was used, and the economic rationales that they continue to rely on only apply to Germany and Italy. The relevance of the exchange rate, the logistical costs, the lead times, control imports for Germany and Italy. They have nothing to do with imports from Mexico. So substantial evidence does not support the commission's finding on that point. On the pricing issue, they continue to say that the dumping margin is irrelevant, and you shouldn't rely on it or worry about it. In fact, Mr. Lewis has gone so far as to now say it's meaningless. It's not meaningless. The statute specifically authorizes the commission to consider it, and more importantly, the statute requires a counterfactual analysis here. It says what would happen if we take the order away? So whether or not you're looking at the magnitude of the margin, you are absolutely required to look at what happens when they start dumping again, and there is absolutely a finding that is not challenged that they will dump. And contentions that that's just some old finding many years ago are disproven by the record evidence showing a very recent finding was that the Mexicans had increased their dumping margin to 12% in a calculated review. So they were coming back in, and they were increasing their dumping margin, notwithstanding this whole local supply control policy that was in effect. That is very relevant to your analysis. I would also urge you to look at the commission's finding of pricing in the last sunset review when they reached an affirmative determination as to these same imports, and there they said the discipline of the orders itself can affect pricing. So they recognize below exactly what the statute says, but here they have not taken that into account. Can you clarify something for me? This is back about the veto power. Suppose the marketing director that one of your counterparts talked about was in fact directing marketing for at least the Alabama and the Mexican plants, put aside Germany and Italy. What would veto mean in that context if that person is involved in daily, weekly discussions and is actually in charge of decisions about what's coming in? Veto seems a peculiar term. It's a strong term, Your Honor, but I think... So I wouldn't expect there would have to be a veto. The marketing director, same guy, is part of the discussion, and they collectively decide, or rather he decides after a collective discussion, there's not going to be a certain amount of... more than a certain amount of imports from Mexico. I would think you wouldn't call that a veto, but that would in fact control the imports. And I wouldn't disagree, Your Honor, but that was not my term. That was their term. They claimed that they had a veto power, and I would interpret a veto power as the court interpreted it in the Newport case below, meaning you would block imports, and that's what the company in that case did. Here, there isn't any blocking of imports, so I'm puzzled as well as to exactly what that means in the context of a company that is not blocking imports. I don't know. That was their... That was the terminology they used to define their policy. The very last point I'd like to make is that Mr. Von Schrill emphasized the lack of industry vulnerability here, and I would emphasize that there is no requirement in the statute that an industry be vulnerable in order to reach an affirmative finding that the imports would have an adverse impact, and of particular significance here is that the Commission did find that other imports here, Korea, Japan, and Taiwan, would all have an adverse impact on the domestic industry, notwithstanding its lack of vulnerability because of their volume and price effects. So the vulnerability finding, or the lack of vulnerability, is not dispositive in any way, shape, or form to the Commission's ultimate conclusion. It was the volume and the price findings as to Mexico that drove the negative decision here. That concludes my statement, unless you have questions. Thank you. Thank you. Cases will be submitted. Court is adjourned. All rise.